## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

AIG SPECIALTY INSURANCE COMPANY, as
assignee and subrogee,

     Plaintiff,

               v.

PEGATRON CORPORATION,

     Defendant.

Civil Action No.
1:18-cv-03701-SDG

## OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment

[ECF 144 and 149] and on Defendant Pegatron Corporation's motion to exclude

the declaration of James T. Geier [ECF 173]. After careful consideration of the

parties' briefing, the Court **DENIES** Pegatron's motion to exclude; **GRANTS IN**

**PART AND DENIES IN PART** Plaintiff AIG Specialty Insurance Company's

motion for summary judgment; and **GRANTS IN PART AND DENIES IN PART**

Pegatron's motion for summary judgment.

## I.    BACKGROUND

Unless otherwise noted, the following facts are undisputed or are supported

by undisputed evidence in the record.[1] In April 2004, Scientific-Atlanta, Inc.

---

[1]    Due to confidentiality concerns, portions of the relevant briefing and record
are filed under seal. To the extent the Court refers to information filed under

entered into a Blanket Purchase Agreement (BPA) with ASUSTek Computer, Inc., under which ASUSTek would manufacture wireless products for Scientific-Atlanta.[2] By 2013, through a series of assignments, Cisco Systems, Inc. (the Insured) acquired Scientific-Atlanta's rights and Pegatron acquired ASUSTek's rights under the BPA.[3]

In 2013, Pegatron began designing and manufacturing two wireless products, comprised of the same component parts, for Insured. One product was intended for residential use and one for commercial use (collectively, the Products).[4] Pursuant to a Master Supply Agreement (MSA), and a later Product Addendum, Insured sold the Products to a customer (Customer).[5] Separate Product Addendums were agreed to for each product Insured sold to Customer under the MSA. In November 2015, Insured sold its connected business device

---

seal, it has found that the information does not need to be sealed, notwithstanding the parties' confidentiality designations.

[2]   ECF 161-1, ¶¶ 1–2.

[3]   *Id.* ¶¶ 1–5; ECF 31, ¶ 7.

[4]   ECF 158, ¶¶ 1–3; ECF 161, ¶ 13.

[5]   ECF 161-1, ¶¶ 9–13.

unit to another entity (Successor), which took over Insured's obligations to Customer under the MSA related to the Products.[6]

According to their specifications, the Products were required to operate within two frequency spectrums, 2.4 GHz and 5 GHz.[7] However, in December 2015, Customer received complaints that the Products were operating in and interfering with the 2.5 GHz frequency spectrum.[8] Though the parties dispute the cause and extent of this interference, they agree that the Products did oscillate into the 2.5 GHz frequency spectrum and that a component part manufactured by a third-party, Skyworks Solutions, Inc., contributed to the interference.[9]

Under the MSA, Insured warranted and represented to Customer that any product supplied pursuant to a Product Addendum would "conform to the applicable Specifications."[10] Insured also represented and warranted that its performance would "comply in all material respects with all Applicable Law."[11] Customer contended that Insured breached these warranties because the Products

---

[6]   ECF 158, ¶¶ 33, 39.

[7]   ECF 158, ¶ 27; ECF 150-9, at 5.

[8]   ECF 161, ¶ 54.

[9]   *Id.* ¶ 60.

[10]   ECF 158, ¶ 74.

[11]   *Id.* ¶¶ 79–80.

operated outside of the 2.4 GHz and 5 GHz spectrums, which violated the specifications and, as alleged by Customer, violated federal communications regulations.[12] On July 21, 2016, Customer sent a formal demand to Insured and requested replacement Products and reimbursement of costs.[13] Customer and Insured entered into a settlement on October 19, 2016, in which Insured agreed to repair or replace defective Products and reimburse Customer for the costs of remediation.[14] Pegatron declined to contribute to the settlement.[15]

Following the settlement, Insured sought indemnification from Successor.[16] Successor rejected the Insured's claim, and in fact sought indemnification from the Insured based on alleged breaches of warranties.[17] Successor and Insured entered into a settlement agreement on September 30, 2016.[18]

---

[12] *Id.* ¶¶ 53–57.

[13] *Id.* ¶¶ 53–57.

[14] ECF 161-1, ¶¶ 73–74.

[15] ECF 158, ¶¶ 47, 49, 58, 60–61.

[16] ECF 161-1, ¶¶ 55, 75.

[17] *Id.* ¶ 76.

[18] ECF 158, ¶ 107.

Insured submitted its claims related to the settlements with Customer and with Successor to its primary insurer, AIG, and its excess insurers.[19] AIG paid Insured the full policy amount of approximately $15 million.[20] On August 2, 2018, Insured and AIG entered into an assignment agreement through which Insured granted AIG the right to pursue any and all claims against Pegatron.[21] Insured and AIG amended the assignment agreement on January 22, 2020.[22]

AIG, as assignee and subrogee of Insured's claims, filed this action against Pegatron to recover the remediation and reimbursement costs Insured paid to Customer.[23] AIG asserts breach of contract and breach of warranty claims under the BPA,[24] a negligent misrepresentation claim,[25] and a breach of contract claim related to the terms and conditions of the purchase order.[26] Both AIG and Pegatron have filed summary judgment motions.[27]

---

[19]   ECF 161-1, ¶ 83.

[20]   *Id.* ¶ 83.

[21]   *Id.* ¶ 84.

[22]   *Id.* ¶ 85.

[23]   ECF 1; ECF 31 (Amended Complaint).

[24]   ECF 31, ¶¶ 24–46.

[25]   *Id.* ¶¶ 47–56.

[26]   *Id.* ¶¶ 57–63.

[27]   ECF 144; ECF 151.

The parties do not dispute the central facts in this case: that the Products, manufactured by Pegatron and sold to Customer by Insured, were required to operate in the 2.4 GHz and 5 GHz spectrums and that the Products operated outside of these spectrums. Pegatron's liability depends on whether the BPA covers AIG's claims, whether AIG can establish the essential elements of negligent misrepresentation, and whether AIG is entitled to indemnity. In its summary judgment motion, AIG also seeks damages for claims belonging to Successor and for Insured's settlement with a non-party customer, Shaw Cablesystems PGP (Shaw), involving similar products. The parties have fully briefed the motions, which are ripe for consideration.[28]

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[28]   ECF 150 (AIG's sealed motion for summary judgment, statement of material facts, and brief in support); ECF 152 (Pegatron's sealed motion for summary judgment, statement of material facts, and brief in support); ECF 157 (Pegatron's sealed opposition to AIG's motion); ECF 158 (Pegatron's sealed response to AIG's statement of material facts); ECF 161 (AIG's sealed response to Pegatron's motion and statement of material facts); ECF 165 (Pegatron's sealed response in support of its motion); ECF 166 (Pegatron's sealed response to AIG's additional statement of material facts); ECF 167 (AIG's sealed reply in support of its motion).

Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the Court in evaluating summary judgment. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead

a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The parties agree that Georgia law applies to AIG's claims.[29] When, as here, this Court exercises jurisdiction based on diversity of citizenship, it applies Georgia law. *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008). Further, the BPA provides that it is governed by Georgia law.[30]

## III.   ANALYSIS

### A.   AIG's Claims Unrelated to Customer

The Court first must determine what claims AIG is entitled to pursue. The parties do not dispute that AIG and Insured entered into a valid assignment agreement, through which AIG can pursue Insured's claims arising out of its sales of the Products to Customer.[31] In addition to these claims, however, AIG seeks damages on the claims Successor has against Pegatron and for claims arising out of products sold to Shaw.[32]

---

[29]   ECF 161-1, ¶¶ 7, 89.

[30]   *Id.* ¶ 7.

[31]   *Id.* ¶¶ 84–85.

[32]   ECF 161, at 34–39.

### i. Successor's Claims

Pegatron argues that AIG lacks assignment rights to assert Successor's claims. Without a valid assignment, AIG lacks authority, as a factual matter, to pursue Successor's claims, and also lacks standing to pursue these claims on behalf of Successor.

AIG responds, first, that Pegatron waived this standing argument as to Successor's claims because it did not plead standing as an affirmative defense.[33] Standing, however, implicates the Court's subject matter jurisdiction and cannot be waived. *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.,* 524 F.3d 1229, 1232 (11th Cir. 2008) ("Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).") (quoting *Cone Corp. v. Fla. Dep't of Transp.,* 921 F.2d 1190, 1203 n.42 (11th Cir. 1991)). Even if this defense were subject to waiver, Pegatron never had the ability to plead standing as an affirmative defense because AIG's Complaint did not contain a single allegation suggesting that AIG was asserting Successor's claims.[34]

---

[33]   ECF 161, at 34–36.

[34]   ECF 31.

The Court agrees with Pegatron that AIG lacks assignment rights with regard to Successor's claims. "An assignment is an absolute, unconditional, and completed transfer of all right, title, and interest in the property that is the subject of the assignment with the concomitant total relinquishment of any control over the property." *Phillips v. Selecto Sci.*, 308 Ga. App. 412, 413 (2011) (cleaned up) (quoting *Allianz Life Ins. Co. of N. Am. v. Riedl*, 264 Ga. 395, 397 (1994)). An assignment of a right to sue must be in writing. *Wirth v. Cach, LLC*, 300 Ga. App. 488, 489 (2009). "Any language, however informal, will be sufficient to constitute a legal assignment, if it shows the intention of the owner of the right to transfer it instantly, so that it will be the property of the transferee." *Nationwide Mut. Ins. Co. v. Kershaw Mfg. Co.*, 198 Ga. App. 153, 154 (1990) (internal citation and punctuation omitted).

The language AIG contends constitutes an assignment appears in a contract between Successor and Insured, in which the parties agreed to "cooperate in good faith and use reasonable efforts to seek recovery from Pegatron and Skyworks . . . any and all costs related to seeking recovery from Skyworks or Pegatron shall be the sole responsibility of [Insured]."[35] This language does not demonstrate

---

[35]   ECF 161, at 34–35.

Successor's absolute and unconditional intention to transfer all rights in its claims against Pegatron to Insured. Instead, the provision imposes an obligation on Insured to carry the costs of any action against Pegatron, whether taken by Insured or Successor.

The case cited by AIG, *Villanueva v. First American Title Insurance Company*, 313 Ga. App. 164, 167, (2011), *aff'd*, 292 Ga. 630 (2013), is distinguishable. There, the Court found that a subrogation provision in an insurance contract was in fact an assignment because it (1) granted the insurer the right to bring a direct action and (2) indicated that, upon payment, the insured no longer had the right to pursue the claims. *Id.* The agreement between Insured and Successor did not grant Insured an exclusive right to sue and did not divest Successor of its rights. Therefore, it is not an assignment.

### ii.     Shaw's Claims

Pegatron argues that AIG cannot pursue its claims related to Shaw because such claims are not alleged in the First Amended Complaint. Pegatron is correct that the First Amended Complaint fails to reference Shaw or any other customer. Despite this, AIG argues that it can seek damages for the Shaw claims because they involve the same Pegatron Products and frequency issues and because the

Complaint seeks recovery of "all loss" to Insured.[36] AIG states that it did not resolve the Shaw claims until November 2018 and did not incur damages until May 2019.[37]

All that is required under the Federal Rules of Civil Procedure's liberal pleading standards "is that defendant be on notice as to the claims being asserted against him and the grounds on which it rests." *Sams v. United Food & Com. Workers Int'l Union, AFL-CIO, CLC*, 866 F.2d 1380, 1384 (11th Cir. 1989). While Pegatron may not have been on notice of the grounds underlying the Shaw claims specifically, it was on notice that AIG claimed a breach of warranty for products with the same component parts that operated outside of the 2.4 GHz and 5 GHz spectrums. During the discovery period, AIG disclosed that it intended to seek recovery related to other customers "to the extent that Insured incurs any damages," and AIG produced wire transfers reflecting payments to Shaw.[38] Based on these disclosures and the allegations in the First Amended Complaint, AIG is permitted to pursue the Shaw claims.

---

[36]   *Id.* at 36–38.

[37]   *Id.* at 37.

[38]   ECF 166, ¶¶ 53, 59.

**B.      AIG's Claims for Breach of Warranty**

On the merits, AIG alleges that Pegatron breached the express warranties it made in the BPA and is therefore liable for the amounts Insured paid to Customer as a result of those breaches. Specifically, AIG claims that Pegatron breached the warranties section of the BPA, Section 7,[39] and the product regulatory compliance section, Section 18, which AIG asserts contains an express warranty.[40] Pegatron argues in response that, regardless of whether the Products failed to operate within the specifications in violation of Section 7, Insured waived the Section 7 warranties through its course of conduct in exchange for lower prices.[41] Pegatron also argues that it complied with Section 18 because it certified that its equipment complied with FCC regulations before delivery, and that the section does not contain a warranty.[42]

**i.      Section 7 of the BPA**

Section 7 of the BPA, titled "Warranties," provides, in relevant part, that Pegatron warrants that:

---

[39]   ECF 152-3, at 8–16.

[40]   *Id.* at 27–28.

[41]   ECF 152-1, at 29–30.

[42]   *Id.* at 19–23.

> 7.1.1 All Equipment shall conform in all material respects to the Specifications and be free from defects in materials and workmanship;
>
> 7.1.2 All Equipment shall function under ordinary use in conformance with the Specifications.[43]

Pegatron does not dispute that the Products fall under the definition of "Equipment" or that, by functioning outside of the 2.4 and 5 GHz spectrums, the Products failed to conform to the defined "Specifications."[44] Pegatron argues, however, that it is entitled to summary judgment on these claims, and AIG is not, because Insured waived these warranties.

In support of its waiver argument, Pegatron cites email communications between Insured and ASUSTek (Pegatron's predecessor) in which Insured negotiated lower prices for certain products in exchange for shorter warranty periods or a complete waiver.[45] At one point, Pegatron notes, Insured conducted a financial analysis on the impact of eliminating the warranties.[46] Pegatron also

---

[43]  ECF 158, ¶ 15; ECF 152-3 at 8.

[44]  ECF 158, ¶ 30.

[45]  ECF 161-1, ¶¶ 28–29.

[46]  *Id.* ¶ 30.

presented evidence that Insured and Pegatron exchanged pricing terms that referenced the absence of warranties on Pegatron's products.[47]

Whether the parties' course of dealing alters the terms of a contract is typically a jury question. *Sw. Plaster & Drywall Co. v. R.S. Armstrong & Bros. Co.*, 166 Ga. App. 373, 374 (1983). The evidence presented by Pegatron is certainly enough to raise an issue of material fact as to whether Insured waived Section 7. This is so even though, as AIG points out, the BPA contains a provision requiring any waivers to be in writing and signed by the parties.[48] "Under Georgia law, it is well-established that even 'a provision against waiver of contractual rights may itself be waived.'" *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1182 (11th Cir. 2010) (quoting *J.W. Truck Sales, Inc. v. Hartrampf Outdoor, L.L.L.P.*, 279 Ga. App. 544, 547 (2006) and *J.E.M. Enters. v. Taco Pronto, Inc.*, 145 Ga. App. 573, 574 (1978)). *See also BCM Constr. Grp., LLC v. Williams*, 353 Ga. App. 811, 816 (2020) (provisions that contract was "entire agreement" or could only be modified by writing did not preclude a finding of oral waiver). Neither party is entitled to summary judgment on AIG's Section 7 claims.

---

[47]   ECF 161-1, ¶ 34; ECF 152-9.

[48]   ECF 161, ¶ 17.

ii.        **Section 18 of the BPA**

Pegatron concedes that any waiver by Insured does not apply to Section 18 of the BPA.[49] Section 18 relates to regulatory compliance and requires that products manufactured by Pegatron comply with "all applicable laws, regulations, standards and/or codes."[50] Pegatron argues that this provision does not operate as an express warranty and, even if it did, the Court is preempted from determining whether the Products comply with applicable law, which in this case would be Federal Communications Commission (FCC) regulations, because Congress granted the FCC sole authority to regulate devices that interfere with radio frequencies.[51] AIG responds that FCC preemption does not preclude its claims and, regardless, Pegatron breached the warranty in Section 18 because, beyond complying with the applicable law, the Products also did not perform in compliance with industry standards, which is a separate warranty.[52] The Court need not wade into the preemption issue because it finds that Pegatron breached an express warranty that the Products would comply with industry standards.

---

[49]   ECF 158, ¶ 119.

[50]   *Id.* ¶ 18; ECF 152-30, at 27.

[51]   ECF 152, at 16–19.

[52]   ECF 161, at 8–11.

### a.  Express Warranty

Section 18 provides, in relevant part:

> **18.  PRODUCT REGULATORY COMPLIANCE.** Equipment delivered hereunder will be manufactured, labeled, certified and will perform in compliance with all applicable laws, regulations, standards and/or codes in effect for the Equipment['s] intended use at the time of delivery. . . . In order to ensure the relevant laws and regulations are satisfactorily met, [Pegatron] agrees to:
>
> (a)  Certify to [Insured] that the Equipment delivered hereunder is in compliance with regulations, laws, standards and/or codes.[53]

AIG contends that the first full sentence of Section 18 is an express warranty that Equipment, such as the Products, will perform "in compliance with all applicable laws, regulations, standards and/or codes in effect for the Equipment['s] intended use at the time of delivery." Pegatron argues that this section contains no warranty and instead obligates Pegatron to take certain steps to ensure compliance, such as certification, which it did prior to delivery of the Products.[54]

Long standing Georgia authority defines an express warranty as

> [A] statement or representation made by the seller of goods, contemporaneously with and as a part of the contract of sale, though collateral to the express object of it, having reference to the character, quality, or title of the

---

[53]   ECF 158, ¶ 18; ECF 152-3, at 27.

[54]   ECF 152-1, at 23.

> goods, and by which he promises or undertakes to insure
> (sic) that certain facts are or shall be as he then represents.

*N. Ga. Ready Mix Concrete Co. v. L & L Const., Inc.*, 235 Ga. App. 68, 72 (1998). This is consistent with Georgia's commercial code, which provides that an express warranty can be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods which is made part of the basis of the bargain." O.C.G.A. § 11-2-313(1)(a)–(b). "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warrant," but affirmations about the product's value or the opinions of the seller do not create a warranty. O.C.G.A. § 11-3-313(2).

Pegatron argues that the first sentence of Section 18 is a prefatory statement that merely describes the purpose of the express obligations contained in the remainder of the section.[55] In other words, according to Pegatron, Section 18 only obligates Pegatron to take certain steps to ensure compliance with all applicable laws, such as certifying the products. Pegatron relies on *McAllister v. Razook*, 180 Ga. App. 585, 586 (1986), in which the Georgia Court of Appeals held that the

---

[55]   ECF 157, at 26.

phrase "[i]n order to maintain [the patient] in a state of comfort and health and to continue to promote proper muscle function," preceding a treatment plan, was "merely prefatory with no connotation of promise or warranty" that the patient maintain a state of comfort and health.

The first sentence of Section 18 differs from the prefatory language in *McAllister*. It states that "Equipment delivered hereunder ***will*** be manufactured, labeled, certified and ***will*** perform in compliance with all applicable laws, regulations, standards and/or codes."[56] Unlike the language in *McAllister*, which said nothing about the state the patient would be in, Section 18 contains a promise that the Equipment ***will*** perform in a certain way. The phrase "in order to" comes later and is followed by obligations meant to "ensure" Pegatron's promise is kept. Further, Pegatron's interpretation of Section 18—that it only obligates Pegatron to take certain steps, like certification, before delivery—would render meaningless the phrase "will perform," which contemplates future performance. Section 18 contains a representation related to the character of the products, *i.e.*, that they will comply with all applicable law and standards and is followed by ways Pegatron can ensure such compliance. This representation is a warranty.

---

56   ECF 158, ¶ 18; ECF 152-3, at 27 (emphasis added).

### b.    The Industry Standards Warranty

Pegatron argues that AIG cannot assert a claim for violations of industry standards because it was not alleged in the Amended Complaint and, moreover, that AIG's evidence concerning industry standards fails to comply with the Federal Rules of Evidence and cannot be considered. The Court rejects both arguments.

The industry standards claim is not new. The Amended Complaint asserts a claim for breach of Section 18 and states that Customer alleged the Products "failed to perform in compliance with all applicable laws, regulations, standards and/or codes in effect for the Equipment at the time of delivery."[57] Indeed, in its claim for negligent misrepresentation, AIG states that Pegatron represented that the Products would comply "with all applicable laws, regulations, standards and/or codes . . . including *(but not limited to)* Federal Communications Commission's regulations prohibiting interference with others' use of frequencies."[58] In January 2020, AIG disclosed that its expert, James T. Geier, would opine on whether the Products violated industry standards.[59] Pegatron was

---

[57]    ECF 31, ¶¶ 28, 37, 50.

[58]    *Id.* ¶ 50.

[59]    ECF 150-41, at 3.

therefore on notice that AIG would pursue a claim based on industry standards. That AIG's focus has shifted away from FCC regulations and towards industry standards is not improper; it is the nature of ongoing litigation.

In its briefing and response to AIG's statement of material facts, Pegatron does not claim compliance with industry standards, but instead makes much of the fact that the only evidence of the relevant industry standards is Geier's report and his references to the 2016 Institute of Electrical and Electronics Engineers, Inc.'s (IEEE) standards. Pegatron argues that these cannot be considered on summary judgment because Federal Rule of Evidence 1002 requires an original writing in order to prove its contents. In response, AIG submitted an additional declaration of Geier that attached the 2012 IEEE standards in their entirety. The 2012 standards were applicable for part of the time Pegatron manufactured the Products, but Geier relied on the 2016 standards in his initial report because those standards cover the remainder of the relevant time period and are inclusive of the 2012 standards.[60] Pegatron has moved to exclude this additional declaration as improper supplementation of expert evidence.[61]

---

[60]   ECF 178, at 12.

[61]   ECF 174.

The additional declaration is irrelevant, however, because "evidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, 'as long as the evidence could ultimately be presented in an admissible form.'" *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.1 (11th Cir. 2021). Even if the Court concluded that the contents of the standards, as recited by Geier, were inadmissible, there is no reason the 2016 IEEE standards could not be presented in their original form at trial.

Moreover, the reason AIG filed the additional declaration and the 2012 IEEE standards seems fairly clear— it wanted to resolve any doubt the Court may have had that the standards Geier opines upon are what he says they are. The 3,000 plus pages Pegatron complains of in its motion to exclude consist of the 2012 IEEE standards, which is precisely what Pegatron complained was not disclosed prior to Geier's original report. Geier's opinion has not changed and the 2012 and 2016 standards, where relevant, are identical.[62] The Court is persuaded by AIG's argument that the 2016 IEEE standards are more comprehensive, considering the relevant time period of this case, and that is why those standards were originally relied upon by Geier.[63] AIG's filing of the supplemental Geier declaration was

---

[62]   ECF 178, at 3.

[63]   *Id.* at 12.

harmless and substantially justified. *Colman v. Home Depot USA, Inc.*, 705 F. App'x 949, 952 (11th Cir. 2017) (supplemental expert report was harmless despite non-disclosure of studies relied upon because expert's opinion had not changed and studies were known to opposing party). Pegatron's motion to exclude is denied.

In his report and supplemental declaration, Geier opines that, during the relevant time period, the IEEE 802.11 specifications were the industry standards applicable to all wireless devices.[64] According to Geier, to comply with those specifications, a wireless device could only operate in the 2.4 GHz and 5 GHz frequencies, and devices operating outside of those spectrums would not be in compliance with 802.11.[65] Between 2012 and 2016, the 802.11 specifications were amended, but still required devices to operate in the 2.4 GHz and 5 GHz frequencies.[66] In Geier's opinion, because Pegatron's Products oscillated into the 2.5 GHz spectrum, they violated industry standards.[67] After AIG disclosed Geier's expert report, Pegatron took his deposition, during which Geier testified

---

[64]   ECF 150-41, at 27–28; ECF 161-5, at 7 ¶ 10.

[65]   ECF 150-41, at 27–28; ECF 161-5, at 8 ¶ 12.

[66]   ECF 150-41, at 27–28; ECF 161-5, at 9–10 ¶¶ 13–15.

[67]   ECF 150-41, at 27–28; ECF 161-5, at 14 ¶ 25.

extensively about the 802.11 specifications and the development of the standard to encompass 2.4 GHz and 5 GHz frequencies.[68]

Pegatron offers no rebuttal to Geier's testimony and makes no attempt to discredit him or his opinions. It is therefore undisputed that Pegatron's Products failed to comply with industry standards because they oscillated into the 2.5 GHz frequency. The Court concludes that Pegatron breached the express warranty in Section 18 of the BPA because the products did not comply with industry standards and, therefore, AIG is entitled to summary judgment on this issue.

### C.   AIG's Claim for Negligent Misrepresentation

Pegatron argues that AIG's negligent misrepresentation claim fails as a matter of law because such a claim cannot be based on representations in the BPA.[69] Pegatron also contends that any representations it made about how the Products will perform are non-actionable because actionable misrepresentations must relate to an existing or past event.[70] Relatedly, according to Pegatron, AIG has not shown that Pegatron knew or should have known that the Products would

---

[68]   ECF 160-1, at 24.

[69]   ECF 152-1, at 24–25.

[70]   *Id.* at 25.

operate outside the specifications.[71] This is particularly true because the component causing the defect was manufactured by Skyworks, not Pegatron.[72] Finally, Pegatron argues that AIG has presented no evidence that Insured reasonably relied on the alleged misrepresentations.[73] The Court agrees that AIG's negligent misrepresentation claim fails as a matter of law.

AIG has not alleged a breach of duty beyond those created by the BPA. Under Georgia law, "a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of contract to avoid harming him." *Wimpy v. Martin*, 356 Ga. App. 55, 56 (2020). "[A] defendant's mere negligent performance of a contractual duty does not create a tort cause of action; rather, a defendant's breach of contract may give rise to a tort cause of action only if the defendant also breached an independent duty created by statute or common law." *Bouboulis v. Scottsdale Ins. Co.*, 860 F. Supp. 2d 1364, 1380 (N.D. Ga. 2012) (internal citations and punctuation omitted). "The general

---

[71] *Id.* at 25–26.

[72] AIG argues that Pegatron blames Skyworks in an attempt to suggest that Skyworks is the proper defendant, but Pegatron's references to Skyworks are limited to its negligent misrepresentation argument.

[73] ECF 152-1, at 27.

rule in Georgia is that a breach of contract cannot constitute a tort unless a special or confidential relationship exists between the parties." *Kin Chun Chung v. JPMorgan Chase Bank, N.A.*, 975 F. Supp. 2d 1333, 1345 (N.D. Ga. 2013).

AIG claims that Pegatron wrongly certified the Products as FCC compliant because the Products delivered to Customer contained a different component than the Products Pegatron tested for compliance.[74] But Pegatron was obligated to certify its products as FCC compliant under Section 18 of the contract,[75] and its failure to test and certify the Products after a new component was added would be a breach of that contractual duty, regardless of whether the breach was caused by Pegatron's negligence. AIG has not alleged, argued, or presented a single fact showing a separate duty that Pegatron owed to Insured that would support a claim for negligent misrepresentation. Pegatron is, therefore, entitled to summary judgment on AIG's negligent misrepresentation claim.

### D.   Indemnification

The Court has found that Pegatron breached a warranty to Insured because the Products failed to comply with industry standards. AIG claims, as the basis for its damages, that this breach of warranty resulted in Insured breaching a warranty

---

[74]   ECF 161, at 31–33.

[75]   ECF 158, ¶ 18; ECF 152-3, at 27.

to Customer and, therefore, Pegatron is liable for the amount Insured paid to customer to settle Customer's claims. Pegatron denies liability, arguing that implied indemnity is only available for tort claims and that the settlement was a voluntary payment that creates no obligation on its part.[76]

### i.   Implied Indemnity

Under Georgia law, "an action for breach of warranty against the seller for damages suffered at the hands of some third party [is] in effect an action for implied indemnity," and Georgia common law regarding indemnity applies. *Alterman Foods, Inc. v. G.C.C. Beverages, Inc.*, 168 Ga. App. 921, 922 (1983) (quoting *Wilson v. Dodge Trucks, Inc.*, 238 Ga. 636, 637 (1977)). It is true that Georgia common law on indemnity developed as a tort theory, and so it "contemplates imputed liability arising from the torts of another." *Emergency Pros. of Atlanta, P.C. v. Watson*, 288 Ga. App. 473, 475 (2007). However, Pegatron cited no authority limiting implied indemnity to tort disputes.

The Court has likewise found little authority on this issue. Though, a Georgia Court of Appeals opinion, *Nguyen v. Lumbermens Mutual Casual Company*, 261 Ga. App. 553, 556 (2003), appears to support Pegatron's position. There, the

---

[76]   ECF 152-1, at 31–34.

court found that common law indemnity principals did not apply where the party seeking indemnification was a surety and, therefore, its liability to the third party stemmed solely from its contractual obligations and not from a wrong imputed to it. *Id.*

Other courts in this circuit have interpreted *Nguyen* narrowly. In *Auto-Owners Insurance Company v. Anderson*, No. 7:03-CV-17, 2005 WL 8166034, at *2 (M.D. Ga. Feb. 10, 2005), for example, the court held that an insurer could seek indemnity from one of its agents who misrepresented policy coverage to a third party. The court, distinguishing *Nguyen*, found it "of no consequence that [the insurer]'s liability to [the third party] was in equity or contract rather than in tort, since the ultimate source of that liability was a wrong allegedly committed by Defendants." *Id. See also Corp. of Mercer Univ. v. JPMorgan Chase & Co.*, No. CIV.A. 5:07-CV-243HL, 2008 WL 822518, at *5 (M.D. Ga. Mar. 26, 2008) (obligor of a bond could seek equitable indemnity against broker whose wrongful conduct resulted in settlement with the IRS because obligor wrongly certified bonds as tax exempt).

The Court finds the Middle District of Georgia authority persuasive and does not read *Nguyen* to preclude indemnity when the underlying dispute sounds in contract, not tort. Accordingly, AIG can seek indemnity from Pegatron for Insured's payments to Customer because Pegatron's breach of warranty was

imputed to Insured. For this reason, the Court also rejects Pegatron's economic loss rule argument.

### ii.      Voluntary Payment

Pegatron argues that Insured's settlement with Customer was an unrecoverable voluntary payment. O.C.G.A. § 13-1-13 provides that "[p]ayments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence [or fraud] are deemed voluntary and cannot be recovered." In other words, "when a payment is made without a contractual or legal obligation to pay it, the payment is voluntary and the payment cannot be recovered." *S. Mut. Church Ins. Co. v. ARS Mech., LLC*, 306 Ga. App. 748, 751–52 (2010). According to Pegatron, Insured's settlement with Customer was voluntary because Insured failed to raise defenses to Customer's claims and the settlement went above the contractual limits on damages in the MSA, meaning Insured was not legally obligated to pay what it did.[77]

"[T]he 'voluntariness' issue does not turn on whether payment was made pursuant to a settlement versus a default or other type of judgment. Instead, a defendant's payment to an injured party is considered 'voluntary' if it was made

---

[77]   ECF 152-1, at 31–34.

in the absence of allegations showing a legal necessity for payment." *Insituform Techs., Inc. v. AMerik Supplies, Inc.*, 850 F. Supp. 2d 1336, 1358 (N.D. Ga. 2012). Indeed, this Court has found that settlement payments made pursuant to a legal obligation are *not* voluntary, even absent a "pending judgment or court order." *Cincinnati Ins. Co. v. Centennial Elementary Sch. PTA, Inc.*, No. 1:18-CV-00334-SDG, 2020 WL 4548753, at *9 (N.D. Ga. Mar. 23, 2020).

Actual liability is not required to show that a settlement was made pursuant to a legal obligation. Instead, where an indemnitee is potentially liable, it may "after giving the indemnitor notice and an opportunity to defend . . . settle a lawsuit and claim indemnity upon a showing that the decision to settle was reasonable." *S. Ry. Co. v. Ga. Kraft Co.*, 823 F.2d 478, 480 (11th Cir. 1987). Only a complete defense to liability would bar recovery where the indemnitee settles the claims against it. *Emory Univ., Inc. v. Neurocare, Inc.*, 985 F.3d 1337, 1347 (11th Cir. 2021) (a complete defense is one that defeats "the entire action and any liability arising therefrom for which the indemnitor would then be liable"). The defenses suggested by Pegatron are debatable and do not "eviscerate" Insured's potential liability. *Id.* That Insured had potential defenses and could have been successful in defending against Customer's claims is irrelevant.

Whether a settlement is reasonable and made in good faith, however, is a question for the jury. *Fed. Paper Bd. Co. v. Harbert-Yeargin, Inc.*, 53 F. Supp. 2d 1361, 1379 (N.D. Ga. 1999); *Union Camp Corp. v. Louisville & Nashville R. Co.*, 130 Ga. App. 113, 116 (1973). Accordingly, a question of fact remains as to whether the amounts Insured paid to settle Customer's claims were reasonable and whether the settlement was in good faith. This includes whether Insured paid amounts beyond what it was permitted to under the MSA. *See Ins. Co. of N. Am. v. Kyla, Inc.*, 193 Ga. App. 555, 556 (1989) (settlement above policy limits unrecoverable).

### E.    Recovery for the $6 Million in Damages Paid by Excess Insurer

Pegatron has moved for summary judgment on the $6 million AIG claims in damages that overlaps with the amounts paid to Insured by its excess insurer, Certain Underwriters at Lloyd's London (Underwriters). Pegatron argues that Insured assigned its claims for these amounts to Underwriters pursuant to a subrogation provision in its policy.[78] The subrogation provision states "[i]f we make a payment under the policy, that right [to recover all or part of the loss] will belong to us."[79] Pegatron is correct that this language constitutes an assignment, which occurred prior to Insured's assignment to AIG; AIG has not offered an

---

[78]   ECF 152, at 36.

[79]   *Id.*

opposition to this argument. Pegatron's argument has merit, and the Court considers its motion as to this issue as unopposed. Accordingly, the Court grants summary judgment to Pegatron as to the $6 million in damages paid by Underwriters.

### F.   Shaw's Claims

Though the Court found that the allegations in the Amended Complaint were sufficient to put Pegatron on notice of the Shaw claims, AIG has not presented sufficient facts to survive summary judgment on these claims. The undisputed facts show that Shaw entered into a contract with Insured,[80] in which Insured warranted that its products would comply with all standards that Insured "placarded" on the products;[81] and, Successor and Shaw entered into an agreement to replace products supplied to Shaw that "exceed[ed] the emissions thresholds applicable in accordance with Canadian laws and regulations."[82] Insured incurred $4,221,088 in costs to repair the noncompliant Products pursuant to a separate agreement with Successor.[83]

---

[80]   ECF 158, ¶¶ 81, 84.

[81]   *Id.* ¶ 82.

[82]   *Id.* ¶¶ 110–11.

[83]   *Id.* ¶ 112.

There is no way to discern from these facts which Canadian law or standard the products sold to Shaw failed to comply, what warranty Insured breached, or whether Shaw or Successor appropriately assigned its claims to Insured. AIG cannot factually support its claims related to the Shaw products. Moreover, AIG provided no basis for the Court to determine whether Successor's settlement with Shaw was reasonable or that Pegatron refused to contribute to it. AIG failed to raise a question of material fact as to whether it can be indemnified for Insured's costs related to the settlement and Pegatron is entitled to summary judgment.

### G.    Pre-Judgment Interest

Finally, Pegatron argues that AIG is not entitled to prejudgment interest because the damages it seeks are unliquidated. Under Georgia law,"[a]ll liquidated demands, whereby agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them." O.C.G.A. § 7-4-15. Damages are liquidated if they are a certain and fixed amount, or "a sum which cannot be changed by proof." *GMC Grp., Inc. v. Harsco Corp.*, 304 Ga. App. 182, 183 (2010). A claim is not converted into one for an uncertain amount because the parties dispute liability, *Holloway v. State Farm Fire & Casualty Company*, 245 Ga. App. 319, 322, (2000) (*bona fide* dispute existed for damages where extent of water damage was unresolved, but not for items with an

agreed upon value where only liability was disputed), or because offsets or credits would lessen the damages amount. *Scovill Fasteners, Inc. v. N. Metals, Inc.*, 303 Ga. App. 246, 252 (2010) (offsets awarded did not render the amounts unliquidated).

Pegatron's argument—that the damages amount is unliquidated because it disputes the reasonableness of the settlement—is not groundless. Facially, Pegatron disputes the amount because it argues that Insured either wrongfully paid or overpaid to replace the Products and remediate. Pegatron does not dispute, however, that Insured paid the amounts it says it did. In other words, the jury will not be asked to determine the amounts Insured actually paid, but whether those amounts were reasonable and, therefore, whether Pegatron is liable for some, all, or none of the settlement. Accordingly, the parties dispute Pegatron's liability, not the measure of the damages. AIG is entitled to prejudgment interest at 7% per annum. O.C.G.A. § 7-4-2; *Sec. & Exch. Comm'n v. Price*, 108 F. Supp. 3d 1342, 1348 (N.D. Ga. 2010).

## IV.   CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** AIG's motion for summary judgment [ECF 144]; **GRANTS IN PART AND DENIES IN PART** Pegatron's motion for summary judgment [ECF 149]; and **DENIES** Pegatron's motion to exclude [ECF 173]. AIG abandoned its representation claim and only

pursued its terms and conditions claim in the alternative to its claim for breach of warranty. AIG's negligent misrepresentation claim fails as a matter of law. Accordingly, Counts III, IV, and V of the Amended Complaint are **DISMISSED**, as are AIG's claims for Successor's damages, the Shaw dispute damages, and the $6 million in damages that overlap with those paid by Underwriters.

Material questions of fact remain as to whether Insured waived the warranty provisions in Section 7 of the BPA and whether Insured's settlement with Customer was reasonable and made in good faith. To the extent Pegatron is liable, 7% per annum prejudgment interest will be assessed against it.

The parties are ordered to file a joint proposed Pretrial Order within 30 days of this Order.

**SO ORDERED** this the 17th day of September, 2021.

Steven D. Grimberg
United States District Court Judge